**NOT RECOMMENDED FOR PUBLICATION**
File Name: 13a0280n.06

**No. 11-6484**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Mar 20, 2013*
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| EMMETT HAWKINS, | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR |
| Plaintiff-Appellant, | ) THE WESTERN DISTRICT OF |
| | ) TENNESSEE |
| v. | ) |
| | ) |
| | ) |
| MEMPHIS LIGHT GAS AND WATER, | ) |
| | ) |
| Defendant-Appellee. | ) |

Before: SUTTON, GRIFFIN, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Emmett Hawkins appeals the district court's order granting his employer, Memphis Light Gas and Water (MLGW), summary judgment in this failure-to-promote race-discrimination case. We AFFIRM.

**I.**

Hawkins, an African-American male, began his full-time employment with MLGW in 1982 as a helper in the Stores division of the Transportation Department. The equipment and materials issued to MLGW's crews, approximately 8,000 items, are kept in the Stores area. MLGW promoted Hawkins several times between 1982 and 2001 to various positions in the Stores division: Foreman in Salvage; Supervisor of Material Control and Salvage, a position he held for approximately thirteen years during which he managed around thirteen employees; and Foreman in Stores.

1

In 2002, Hawkins applied for a Supervisor, Stores position and was interviewed by Mary Helen Lovett, Manager of Transportation and Stores, and another MLGW employee. On Lovett's recommendation, MLGW awarded the position to Nancy Mitchison, a Caucasian woman.

On February 28, 2006, MLGW posted a job announcement for another Supervisor, Stores position. The announcement stated under "duties": "[t]rain, direct and supervise employees engaged in receiving, transferring, issuing material and inventory count; salvaging or recycling Division materials, disposing of hazardous materials and operating company store."

Under "Specifications," the announcement stated:

> Bachelor's degree in Business Administration with 4 to 6 years of [S]tores experience **OR** 10 years of journeyman level experience in [S]tores with 2 to 4 years Foreman experience. Must successfully complete Supervisor Assessment Center. Must be familiar with the operations of the Stores Department. Must have a valid driver's license from state of residence.

(emphasis in original). The Supervisor Assessment Center ("Assessment") is a training course MLGW required of all management and supervisory employees.

Human Resources representative Verlinda Henning testified that she reviewed the three applications MLGW received for the position, consulted the applicants' personnel files, and filled out a "research sheet" for each applicant. Henning determined that two applicants, Hawkins and Nancy Miller, met the position's minimum qualifications. Hawkins had approximately nineteen years of journeyman-level experience in the Stores division, with approximately ten years as a Foreman. Miller had approximately fifteen years of journeyman-level experience in the Stores division, with approximately five years of experience as a Foreman. Miller did not have a college degree. At the time of the interview, Hawkins was six weeks shy of being awarded a Bachelor's of Science degree in Business Administration.

After Henning informed Lovett that Hawkins and Miller met the posted qualifications, Lovett scheduled their interviews. Before the interviews, Lovett learned that Miller had not completed the Supervisor Assessment Center, and requested that Miller be scheduled to complete the Assessment on April 3, 2006. Lovett was aware that Hawkins had completed the Supervisor Assessment Center in June 1987.

Lovett and Henning interviewed Miller and Hawkins on March 29, 2006, employing identical interview sheets. On fourteen questions, interviewees could be scored at 0, 10, 20, or 30 points on each question, the maximum total points being 420. The comments and scores on the scoring sheets were handwritten.

After both interviews were completed, Henning and Lovett discussed the interviewees' responses. Lovett decreased Hawkins's interview score by 20 points in two sections, the question "[W]hat are the supervisor's most important responsibilities?" and "Problem Solving," and Henning increased Hawkins's score in two sections, "Problem Solving" and "Motivation." Based on these changed scores, Lovett's score for Hawkins was 260 and Henning's score was 280. Both Henning and Lovett scored Miller at 400 out of 420 possible points.

After the interviews, both Lovett and Henning filled out Selection Rating Cards. These cards compiled two weighted components: the interview (30 points) and the Supervisor Assessment Center (20 points) for a total of up to 50 points. A score of 40–50 points constitutes a "Superior" rating; 31–29 points an "Acceptable" rating; 17–30 points a "Marginal" rating; and 16 and below an "Unacceptable" rating. Hawkins received a weighted interview score of 19 points from Lovett and 20 points from Henning, and 20 points for completing the Supervisor Assessment Center. Accordingly, he was scored a total of 39 points (Acceptable) by Lovett and 40 points (Superior) by

3

Henning. Lovett and Henning both gave Miller a weighted interview score of 29 points and awarded her 20 points for completing the Supervisor Assessment Center. Miller's total score on Lovett and Henning's Selection Rating Cards was 49 points (Superior).

On April 5, 2006, Henning inquired whether Miller had successfully completed the Supervisor Assessment Center. On April 6, 2006, a member of the Training Center staff confirmed that Miller had completed the Assessment, and Henning emailed the update to Lovett.

On April 17, 2006, Rutha Griffin, Henning's supervisor, sent an interdepartmental correspondence to Joseph Lee III, the then-President and Chief Executive Officer of MLGW, detailing Hawkins and Miller's backgrounds and requesting approval to offer the position to Miller. The correspondence omitted that Hawkins had or nearly had completed a Bachelor's degree. Lee approved the request, and MLGW informed Hawkins and Miller of the decision to hire Miller on May 2, 2006.

Hawkins filed a charge with the Equal Employment Opportunity Commission (EEOC), which determined on April 14, 2008, that there was reasonable cause to believe that MLGW denied Hawkins the promotion because of his race. Hawkins filed suit in federal district court on January 16, 2009, alleging failure to promote based on race discrimination.

The district court granted summary judgment in MLGW's favor, concluding that Hawkins failed to show pretext. Hawkins timely appealed.

**II.**

We review a district court's grant of summary judgment de novo. *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 723 (6th Cir. 2012). Summary judgment is appropriate if the pleadings, depositions and other documentary evidence show that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). As the moving party, MLGW has the burden to show that there are no genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The court considers the evidence in the light most favorable to Hawkins and draws all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Title VII prohibits an employer from "discriminat[ing] against any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). To assess Hawkins's race discrimination claim, we apply the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, a plaintiff can establish a *prima facie* claim of racial discrimination based on a failure to promote by demonstrating that: (1) he is a member of a protected class, (2) he applied and was qualified for a promotion, (3) he was considered for and denied the promotion, and (4) other employees of similar qualifications who were not members of the protected class received promotions. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020–21 (6th Cir. 2000). After the plaintiff has made out a *prima facie* case, the burden shifts to the employer to present a legitimate, nondiscriminatory reason for its actions. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Once the employer provides a non-discriminatory reason, the burden of production then shifts back to the plaintiff to show that the employer's proffered reason was a pretext. *Id.* Pretext may be demonstrated if "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews*, 231 F.3d at 1021. Whichever method a plaintiff employs, he retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendant's]

explanation and infer that the defendant[] intentionally discriminated against him." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001)).  If the plaintiff can show pretext, the trier of fact may infer discrimination. *Dews*, 231 F.3d at 1021.[1]

MLGW sought summary judgment on the sole ground that Hawkins could not establish that its proffered nondiscriminatory reason for promoting Miller instead of Hawkins, *i.e.*, that "she demonstrated greater initiative and leadership than Plaintiff, two of the most critical attributes necessary for the Supervisor, [S]tores position," was pretextual.  Lovett testified that as Manager of Transportation/Stores, she observed Miller and Hawkins in various capacities and concluded that Miller was better qualified for the position.  Lovett stated that Miller "would keep me on my toes about things I needed to do.  [Miller] made my job easy."  In contrast, Lovett asserted that she had to "check up behind [Hawkins], ask him for things, communicate the same information several times to get it done . . . . It just made my job tougher."  In addition, Henning testified that Hawkins's answers to certain interview questions indicated that he disliked preparing reports, budgeting, and performing "two-minute reviews" — functions that MLGW contended were a "large part" of what the position entailed.

Selecting a more qualified candidate constitutes a legitimate, non-discriminatory reason. *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011) (deciding "to promote a more qualified candidate" is a legitimate nondiscriminatory justification); *White v. Columbus Metro. Hous.*

---

[1]Hawkins's counsel conceded at oral argument that his claim is properly analyzed under a single-motive framework.

*Auth.*, 429 F.3d 232, 245 (6th Cir. 2005). Thus, the burden shifts back to Hawkins to offer evidence sufficient for a jury to find that MLGW's proffered reason was pretextual.[2]

Hawkins attempts to show pretext by arguing that he was more qualified than Miller for the position of Supervisor, Stores. "In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006). An employer has even greater flexibility where, as here, a management position is at issue. *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) (citing *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982)).

Hawkins argues that Miller's failure to complete the Supervisor Assessment Center before the application period for the Supervisor, Stores position closed made Miller unqualified for the position and thus Hawkins was a plainly superior candidate. Hawkins asserts that a candidate must complete the Assessment before the job application period has closed. MLGW maintains that it is standard procedure for candidates to interview before completing the Supervisor Assessment Center.

Paula Mitchell, a MLGW Human Resources representative, and Lovett both testified that it is standard procedure for candidates to interview for a position before completing the Assessment. Their testimony is bolstered by the fact that the research sheets that MLGW used to initially assess which candidates were qualified did not include a section relating to the Supervisor Assessment

---

[2]Hawkins argues that the district court should have denied summary judgment because MLGW's motion "does nothing more than reiterate that its reason for hiring Ms. Miller over [Hawkins] was reasonable and non-discriminatory," and that this argument does not establish that Hawkins cannot show that the proffered reason was actually pretextual. However, the burden is on Hawkins to show pretext.

7

Center. The job posting for Supervisor, Stores does not support Hawkins's conclusion. It states that any applicant "Must successfully complete Supervisor Assessment Center." A commonsense reading of this statement is that a candidate could complete the Assessment after the application period closed and remain qualified at the time he or she applies.

Hawkins also maintains that he was plainly the superior candidate based on a comparison of his and Miller's qualifications. In conducting a comparison of the candidates' qualifications, we do not substitute our judgment for that of management. *See Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000)). Instead, we "simply compare characteristics such as '[d]ifferences in job title, responsibilities, experience, and work record,'" in order to make an informed determination regarding whether an employment decision was based on pretext. *Johnson v. Metro. Gov. of Nashville and Davidson Cnty., Tenn.*, Nos. 10-6102, 11-5174, 2012 WL 4945607 at *15 (6th Cir. Oct. 18, 2012) (citing *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004)).

Hawkins asserts that because he has a Bachelor's degree and Miller does not, he was significantly more qualified than Miller. The job posting required *either* "[a] Bachelor's degree in Business Administration with 4 to 6 years of [S]tores experience OR 10 years of journeyman level experience in [S]tores with 2 to 4 years Foreman experience." Both Hawkins and Miller exceeded the qualifications for the position based on their years of journeyman experience. Moreover, Hawkins was not awarded his Bachelor's degree in Business Administration until six weeks after the interviews were completed, and one month after the job was awarded to Miller. The fact that Hawkins was in the process of completing his Business Administration degree would not have

8

qualified him for the position absent his journeyman experience, and does not discredit MLGW's explanation that Miller was more qualified.

Hawkins also argues that he was significantly more qualified than Miller because he, unlike Miller, had the qualifications to compete for the position of Assistant Manager, Stores — a job one level above the Supervisor, Stores position at issue here. However, the qualifications for the Assistant Manager of Stores position are not relevant to this case. Similarly, Hawkins argues that he was more qualified than Miller because his then-current position of Foreman, Stores was directly below the position of Supervisor, Stores. This cannot establish pretext given that both Miller and Hawkins had extensive experience in the Stores division as required by the job posting.

The record thus does not support that Hawkins was the plainly superior candidate such that no reasonable employer would have chosen Miller over Hawkins. When analyzing Hawkins's argument, we must "look to the employer's motivation, not the applicant's perceptions, or even an objective assessment, of what qualifications are required for a particular position." *Wrenn*, 808 F.2d at 502. Although Miller had fewer years of experience than Hawkins, she far exceeded the minimum requirements for the position and was highly regarded by MLGW management. Indeed, Miller's reviews for the five years before the promotion decision were better than Hawkins's. Reasonable decision-makers could thus disagree as to which candidate was better qualified. *See Bender*, 455 F.3d at 628.

Nor did Hawkins provide additional probative evidence of race discrimination. Hawkins alleges that crediting Miller with points for completing the Supervisor Assessment Center in advance of her actual completion of the Assessment creates a disputed issue of material fact regarding MLGW's proffered reason. However, there is documentary evidence and testimony in the record

9

that Henning awarded Miller the points *after* she learned that Miller had actually passed the Supervisor Assessment Center. In fact, Henning's Selection Rating Cards for both Miller and Hawkins are dated April 6, 2006 — the day that Henning and Lovett learned that Miller had passed the Supervisor Assessment Center.

Even if Henning and Lovett filled out Selection Rating Cards without knowledge that Miller had passed the Assessment, Hawkins's argument falters because no employment action was taken based on this score. It was not until April 17, 2006, eleven days after Henning learned that Miller had successfully completed the Supervisor Assessment Center, that Henning's supervisor sent a request for approval to offer the position to Miller. When MLGW offered Miller the job, it is undisputed that the score of 49 points was, in fact, a correct reflection of Miller's weighted interview and Supervisor Assessment Center scores. Had Miller failed to complete the Assessment, or the position been offered to her in advance of its completion, the fact that the Selection Rating Cards erroneously reflected her completion of the Assessment would perhaps create a disputed issue of material fact. However, Hawkins has not shown that "any of these alleged procedural irregularities prejudiced him in the selection process or indicate any dishonesty or bad faith on behalf of [MLGW]." *Briggs v. Potter*, 463 F.3d 507, 516 (6th Cir. 2006) (quoting *Williams v. Columbus Metro. Hous. Auth.*, 90 F. App'x. 870, 876 (6th Cir. 2004) (unpublished) (internal quotation marks omitted)). "[T]he inconsistencies cited by [Hawkins] relate entirely to matters of process and have no bearing on [MLGW's] reasons for not promoting [him]." *Id.* (quoting *Williams*, 90 F. App'x at 877).

Hawkins also argues that racially-motivated collusion between Lovett and Henning led them to reduce his interview scores, and that but for this downgrade, his scores would have been superior to Miller's. Hawkins's argument appears to be based on the premise that the 20-point downgrade

10

in Lovett's initial interview score would have raised his score from 260 points to 280 points, and this change would have increased Hawkins's weighted interview score on Lovett's Selection Rating Card from 19 points to 20 points. This change, combined with his Supervisor Assessment Center score of 20, would have given him a total score of 40 on Lovett's Selection Rating Card and boosted him from the "Acceptable" range to "Superior" range in Lovett's Selection Process Final Ratings. However, Hawkins's math appears faulty. Although such a rating would have brought him into the same "Superior" range as Miller, Miller's total score was 49 points. Thus, even without Lovett's change, Hawkins's score still would have trailed Miller's score by 9 points.

In addition, nothing in the record shows that Henning or Lovett changed their interview scores based on discussions after the interviews. While Lovett's Structured Interview Record shows that she downgraded Hawkins's scores in two categories at some point, Hawkins's assertion that Lovett's change of score occurred after conferring with Henning is unsupported. The portion of Henning's deposition transcript that Hawkins cites to support this proposition states the opposite conclusion: Henning testified that after the candidates left, Henning and Lovett rated each candidate independently of each other and *then* discussed their general overall impression.

More generally, Hawkins argues that MLGW has a "culture of discrimination against [African-Americans]" and that there was a "glass ceiling that prevents [African-Americans] from obtaining any level higher than [F]oreman." To support this claim, Hawkins cites Lovett's testimony that she did not promote an African-American to a position above Foreman until 2009. With this argument, Hawkins confuses evidence of discriminatory treatment with a claim of disparate impact. *See Hartsel v. Keys*, 87 F.3d 795, 801 n.4 (6th Cir. 1996). A disparate impact theory of discrimination exists because "some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination."

11

*Id.* (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988)). To create a *prima facie* case of discrimination under a disparate impact theory, a plaintiff must show "that a specific employment practice or policy caused a significant disparate impact on a protected group," in this case, African-Americans. *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989)). Hawkins has identified no such practice or policy. Additionally, Hawkins did not provide any statistics or statistical analysis regarding the number of qualified African-Americans who allegedly applied for positions. Without evidence of the racial composition of the pool of qualified candidates, a reasonable factfinder would be unable to determine whether bias motivated MLGW's decisions, or if the decisions were based on legitimate selection criteria or chance. *See Hopson v. DaimlerChrysler Corp*. 306 F.3d 427, 437–38 (6th Cir. 2002) (acknowledging that "there are three possible explanations for the [statistical] discrepancy: the operation of legitimate selection criteria, chance, or the defendant's bias," and determining the existence of a fact issue on bias only after concluding that disparity is "more likely than not due to the defendant's bias") (citation omitted); *see also Hopkins v. Canton City Bd. of Educ*., 477 F. App'x. 349, 358–59 (6th Cir. 2012) (rejecting an inference of pretext where the plaintiff's statistical evidence did not provide information regarding "the racial composition of the pool of qualified [] candidates" and there is a "small sample size").

This court has granted "great flexibility to employers when selecting management personnel . . . [and] has explicitly held that the law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with." *Browning v. Dep't of the Army*, 436 F.3d 692, 698 (6th Cir. 2006) (citations and internal quotation marks omitted) (quoting *Hartsel*, 87 F.3d at 801); *Wrenn,* 808 F.2d at 502 ("So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates."). A plaintiff opposing a summary-judgment motion

12

"cannot 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 533 (6th Cir. 2012) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Hawkins failed to make such a showing.

### III.

For these reasons, we AFFIRM the judgment of the district court.